**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TRACY RUDDER, a Personal
Representative for The Estate of
KATIE NICHOLE PRIMEL,

Plaintiff,

v.

GENESEE COUNTY, *et al.*,

Defendants.
______________________________/

Case No. 24-cv-10302

Hon. Brandy R. McMillion
United States District Judge

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO STRIKE OR, IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S SIXTH AMENDED COMPLAINT (ECF NO. 86)**

Plaintiff Tracey Rudder ("Plaintiff" or "Rudder"), as Personal Representative of the Estate of Katie Nichole Primel ("Primel"), brings this civil rights action against Defendants Genesee County, Deputy Anessa Israel ("Israel"), Advanced Correctional Healthcare, Inc. ("ACH"), and Kelly Leonard ("Leonard") pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. *See generally* ECF No. 83. Plaintiff alleges that Defendants violated Primel's constitutional rights by acting with deliberate indifference to her serious mental-health needs and risk of suicide while she was detained at the Genesee County Jail ("GCJ"), ultimately resulting in her tragic death. *Id.* Before the Court is Defendants ACH and Leonard's Motion to Strike or, in the Alternative, to Dismiss

Plaintiff's Sixth Amended Complaint (the "Motion").[1] *See generally* ECF No. 86. The parties adequately briefed the Motion, and the Court will rule without a hearing. *See* ECF Nos. 86, 90, 92; *see also* E.D. Mich. LR 7.1(f)(2). For the reasons explained below, Defendants' Motion (ECF No. 86) is **DENIED.**

**I.**

Katie Primel was booked into the GCJ for pretrial custody on or around July 8, 2021. ECF No. 83, PageID.1713. From the time when Primel entered custody until her death, both Genesee County staff and ACH were responsible for the health and safety of the people in custody at the GCJ, as ACH had a contract with Genesee County to provide medical care at the jail. *Id.* at 1706. ACH was required to provide care in accordance with applicable GCJ facility rules and standards set by the National Commission on Correctional Healthcare ("NCCHC"). *Id.* at 1712. Notably, NCCHC policy states that a mental health professional should not decline to place a detainee on suicide observation solely because the detainee denies having suicidal ideation. *Id.* at 1723.

[1] Defendants moved to strike the Plaintiff's Sixth Amended Complaint on the grounds that the Court had yet to issue a ruling on Defendants' Objection to the Report and Recommendation allowing Plaintiff to amend her complaint. ECF No. 86, PageID.1785. On December 30, 2025, the Court issued its Order Adopting the Recommended Disposition of the Magistrate Judge's Report and Recommendation, Overruling Defendants' Objections, Accepting as Filed the Sixth Amended Complaint, and Ordering the Magistrate Judge to Issue a Report and Recommendation on the Motion to Dismiss. *See* ECF No. 89. Accordingly, to the extent that Defendants' Motion seeks dismissal based on the procedural defect, that argument is now moot as the Court has accepted the Sixth Amended Complaint as the operative complaint in this case. *Id.*

Primel struggled with her mental health prior to being detained—she suffered from depression and had attempted suicide. *Id.* at 1713, 1716. Both Genesee County and ACH staff were made aware of Primel's history of suicidal ideation shortly after she entered custody. *Id.* at 1713. On or around July 10, 2021—just days after she was booked into the GCJ—Primel wrote a kite to jail staff, stating "please I cannot live like this much longer I wont' [sic] live like this." *Id.* On or around July 19, 2021, Primel reiterated this sentiment; she completed an intake form and indicated that in the past few weeks, she wished she was dead. *Id.*

On July 21, 2021, Primel completed two forms at the GCJ. *Id.* at 1713. The first was ACH's Medical History and Health Appraisal, which was included in ACH's Nurse Orientation Manual—on this form, Primel indicated that she had a "history of suicide." *Id.* Defendant Leonard, an ACH employee, signed Primel's Medical History and Health Appraisal. *Id.* The second form Primel completed was an ASQ Suicide Risk Screening Tool—on this form, Primel indicated that she had previously attempted suicide and was depressed as a result of her incarceration. *Id.* Though Primel stated twice that she had a history of suicidal ideation, Defendant Leonard did not place Primel on suicide observation, as required by ACH's form. *Id.* at 1716. Further, Defendant Leonard did not alert other GCJ or ACH staff about Primel's suicidal ideation, or follow up to ensure that Primel received mental health services. *Id.*

**A. August 2021 Kites**

Plaintiff alleges that in the kites Primel submitted to the GCJ in August, she expressed suicidal ideation. *Id.* at 1714. On or around August 6, 2021, Primel wrote her third kite and stated, "I need to get out of here or it won't even matter im [sic] gonna be dead." *Id.* She filled out a fourth kite on or around August 13, 2021, stating "Im sick of fighting for a life I don't even want so you probably wont be hearing from me again I cant and wont do this I give up im a piece of shit anyway and cant do shit right so whats it m[a]tter im done with it al[l] tell my bo[y]s I [l]ove them and im sorry." *Id.* On or around August 17, 2021, Primel wrote her fifth kite and stated "im so sick right now I just give up im gonna die in here."

Primel submitted her sixth kite on or around August 23, 2021 and stated "Whatever I knew nobody gave a single fuck about me doesn't matter I told you I was gonna die in here I really am im barely even allowed out of my hole anymore im over it idc I wish I would just go to sleep and not wake up seems like that would be best for everyone." *Id.* On or around August 30, Primel filled out her seventh kite and stated, "get me out please I cant do it no more."

**B. September 2021 Kites**

As alleged in the complaint, Primel submitted a request to meet with a psychiatrist on or about September 1, 2021. *Id.* at 1715. She submitted two kites that month, which brought her total kites submitted to nine. *Id.* On or about

September 2, 2021, Primel filled out her eighth kite to jail staff, stating "I ne[e]d out you don't fucking understand I will fucking kill myself if [I have] to be here any longer im not joking." *Id.* Primel did not receive a mental health referral until approximately two days later, on or about September 4, 2021. *Id.* She denied having suicidal or homicidal ideations, but the referral noted that "patient states she is suffering from depression." *Id.* On approximately September 5, 2021, Primel completed a ninth kite and stated "I told you im gonna die in here." *Id.* On approximately September 7, 2021, Jule Rexroth reviewed the referral order, which she completed on September 17, 2021. *Id.* Primel was diagnosed with adjustment disorder that same day. *Id.*

### C. October 2021 Kites

The complaint further details that the kites continued. In October, Primel submitted two kites, bringing her total number of kites submitted to eleven. *Id.* On approximately October 1, 2021, Primel completed her tenth kite, stating "tell my boys I love them im probably never gonna see them again." *Id.* On or around October 22, 2021, Primel filled out her eleventh kite and stated, "fucking figures thanks anyway im not doing this anymore I give up." *Id.*

### D. December 2021: Primel's First In-Custody Suicide Attempt

On approximately December 14, 2021, staff noted a refusal of treatment for Primel's Synthroid—a medication whose refusal was known to cause "mental health

problems and death."[2] *Id.* at 1716. On or about December 22, 2021, Primel wrote her twelfth kite, which stated "I just want out now im over it I barely even get out of bed anymore unless its to try and talk to the boys im so depressed." *Id.* On December 31, 2021, Primel called her mother and informed her that she had been placed in protective custody "cause I tried to kill myself." *Id.*

### E. February 2022: Primel Writes Letter Expressing Suicidal Ideation, Requests Placement in Protective Custody, and Alleges Mistreatment by Staff

Primel allegedly submitted her thirteenth kite on or around February 1, 2022, which stated "Im not gonna call today cuz Im depressed." *Id.* On or around February 17, 2022, Primel wrote a letter that she allegedly provided to jail staff where she discussed being placed in a restricted housing unit and stated, "I just wanna go home I'm seriously gonna fucking kill myself if I have to live like this anymore." *Id.* The complaint alleges that at least one staff member—GCJ Deputy Adams—was given the letter, but upon reading it, advised that there was nothing she could do to assist Primel. *Id.* at 1719-1720. No staff member reported Primel's expressed suicidal ideation to the shift commander, nor was Primel placed on suicide watch. *Id.* at 1720.

Additionally, Primel was not referred for a mental health evaluation in the immediate aftermath of the letter's distribution. *Id.* On or about February 18, 2022,

---

[2] The Complaint does not specify whether the staff who noted this refusal were Genesee County staff or ACH staff.

Primel was forcibly moved to a different cell. *Id.* at 1717. She requested placement in protective custody on February 19, 2022. *Id.* At some point between February 19, 2022 and her death on March 7, 2022, Primel was removed from protective custody. *Id.*

Finally, the Complaint alleges that on two occasions in February, Primel suffered mistreatment at the hands of staff. Plaintiff states that Primel filed a grievance on February 21, 2022, that she was "made [to] sleep on the floor for three days without a mat or blanket threw my food on the ground like I was a dog." *Id.* at 1718. In a separate incident at the end of February, Primel stated that she was "handcuffed to a bench for 3-½ days, [staff] gave everyone but me a mat and a blanket… made me sleep on the cold bench…put me in a freezing cell…." *Id.* at 1719.

## F. Allegations about Primel's Additional Suicide Attempts and Staff Failures to Provide Primel's Prescribed Medication

The Complaint also states that several other incidents related to Primel's mental health occurred while she was in custody. First, in addition to Primel's attempted suicide in December of 2021, the complaint alleges that Primel attempted suicide on other occasions by sticking a metal object in a wall outlet. *Id.* at 1719. Johnson, a fellow detainee, stated that near the end of February 2022, Primel said that if she was not permitted to leave the facility, she was going to kill herself. *Id.*

Second, the Complaint alleges that Primel was either routinely refused or was not given her medication while in custody. Between August 7, 2021 and February 20, 2022, Primel was allegedly offered her prescribed medication, Levothyroxine, 56 times, but took the medication just twice. *Id.* at 1718. Primel was marked as a "no show" for the medical cart 29 times and therefore did not receive her medication. *Id.* at 1718. Genesee County Jail Seargent Vernier observed that on thirteen occasions, Primel's refusal to take her prescribed medication could result in a "possible delay in therapeutic level of needed medication to treat a medical/mental health problem and possible death." *Id.* at 1719. On two occasions, Primel's medication was withheld from her—one such incident occurred on or around January 11, 2022, when Primel filed a grievance request stating that staff member "Sweeny" failed to give Primel her medication. *Id.* at 1717. Primel also alleged that on two other occasions, her medication was out of stock. *Id.* at 1718.

**G. March 7, 2022: Primel Dies by Suicide**

Primel died by suicide on March 7, 2021. *Id.* at 1722. That morning, Defendant Israel allegedly falsely recorded that she did a floor check between 6 and 8 AM and observed Primel moving and alive during that time. *Id.* at 1720-1721. Plaintiff further alleges that Defendant Israel entered an additional false log stating that at 10:14 AM, she asked Primel if she wanted her outside time, and that Primel refused. *Id.* at 1721. Plaintiff alleges that video evidence shows that Defendant

Israel was sitting at her desk at 10:14 AM. *Id.* At 11:31 AM, Defendant Israel allegedly noticed that Primel was sitting on the floor against her lower bunk. *Id.* Israel allegedly called out Primel's name, but Primel did not respond. *Id.* Primel was allegedly discovered in her cell, hanging from her bed by a sheet. *Id.* Personnel at the GCJ allegedly attempted to resuscitate Primel but were unsuccessful. *Id.* At approximately 11:40 AM, EMS allegedly entered Primel's cell and were briefly able to resuscitate her; she was then taken to the Hurley Medical Center, where she later died. *Id.* at 1721-1722. The Forensic Autopsy Report indicates that Primel's manner of death was suicide. *Id.* at 1722.[3]

**H. Procedural History**

This case has a long and complex procedural history, including the filing of multiple amended complaints, the addition and removal of several parties, and the Court being asked to resolve multiple motions to dismiss as to both standing and merits issues. Most relevant for purposes of this Motion is that Rudder, with the Court's permission, filed the operative amended complaint (the "Sixth Amended Complaint") on December 10, 2025. ECF No. 83; *see also* ECF No. 89. The Defendants in this case now include Genesee County and its employee, Deputy Anessa Israel ("Israel"), Advanced Correctional Healthcare, Inc. ("ACH"), and two

[3] Defendants ask this Court to take judicial notice of additional facts that were not pleaded in the Complaint. ECF No. 86, PageID.1780-82, 1787-88. For reasons discussed below, these facts were not included in the Court's recitation of the facts.

ACH employees, Nurse Kelly Leonard ("Leonard") and John Doe ("Doe") (collectively the "ACH Defendants"), all of whom Rudder contends are responsible for Primel's death. ECF No. 83. After Rudder filed her operative amended complaint, the ACH Defendants filed the present motion to strike the amended complaint, or, alternatively, dismiss Rudder's claims against them. ECF No. 86.

## II.

A plaintiff must file a complaint that is "plausible on its face." *See City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In reviewing a 12(b)(6) motion, the Court will assess whether a plaintiff's well-pleaded factual allegations "allow[s] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mattera v. Baffert*, 100 F.4th 734, 739 (6th Cir. 2024) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). At this stage of the litigation, the Court must construe the complaint in the light most favorable to the plaintiff. *See Norris v. Stanley*, 73 F.4th 431, 435 (6th Cir. 2023). The Court must also "accept all of the complaint's factual allegations as true and determine whether these facts sufficiently state a plausible claim for relief." *Fouts v. Warren City Council*, 97 F.4th 459, 464 (6th Cir. 2024) (citing *Twombly*, 550 U.S. at 555-56).

Pleadings that are no more than legal conclusions are not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *see also Twombly*, 550 U.S. at 555 n.3 ("Without some factual allegation in the complaint, it is hard to see how a claim could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."). But still, "a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"." *Twombly*, 550 U.S. at 555. In evaluating whether a case should survive a 12(b)(6) motion, the Court will only look to the four corners of a complaint, apart from "materials attached to a motion to dismiss if they are referred to in the complaint and central to the claim." *Berry v. United States Dep't of Lab.*, 832 F.3d 627, 637 (6th Cir. 2016).

**III.**

**A. Judicial Notice**

ACH asks the Court to take judicial notice of medical records attached to Plaintiff's Fourth Amended Complaint, which it contends show Primel denied suicidal ideation on eleven occasions. ECF No. 86, PageID.1780-1782, 1787-1788. Those records were attached to a superseded pleading. In ruling on a Rule 12(b)(6) motion, a court may take judicial notice "only of facts which are not subject to reasonable dispute." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). For records that were not referenced in the operative complaint, the Court

may notice them only for the fact that the entries were made, not for the truth of their content. *Id.* What Primel told ACH agents, and whether those statements reflected her actual risk, is what is disputed. The Court therefore considers these materials only as reflecting what ACH's records state and draws all reasonable inferences from them in the Plaintiff's favor, as it must at this stage.

**B. Deliberate Indifference**

Plaintiff alleges that the Defendants Leonard and John Doe showed deliberate indifference to her medical needs. A brief note on the applicable test: courts have "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021). Accordingly, to allege a deliberate-indifference to medical needs claim, a pretrial detainee bringing a claim under the Fourteenth Amendment has historically been required to plead (1) "the deprivation alleged [is], objectively, sufficiently serious" such that the inmate "is incarcerated under conditions posing a substantial risk of serious harm"; and (2) the prison official subjectively demonstrated a "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted).

For a time, the Sixth Circuit eliminated the subjective component of a pretrial detainee's deliberate-indifference claim. *Brawner*, 14 F.4th at 596. This departure, the court reasoned, was merited because pretrial detainees "have not been convicted

of anything," and as they are constitutionally presumed innocent, "the punishment model is inappropriate for them." *Id.* However, the Sixth Circuit recently reversed course and reinstated the subjective prong of the deliberate-indifference test for most conditions-of-confinement claims brought by pretrial detainees. *Poynter by & through Fernandez v. Shirley*, No. 25-5188, 2026 WL 2641092, at *6 (6th Cir. Sept. 8, 2026). Accordingly, we proceed with the test as articulated in *Farmer* and address both the objective and subjective prongs.

**C. Deliberate Indifference Claims Against Leonard**

The Estate of Primel alleges that ACH employees, including Leonard, had actual and subjective knowledge of Primel's serious medical needs and acted with deliberate indifference to Primel's safety, in violation of the Eighth and Fourteenth Amendments. ECF No. 83. PageID.1739. The Eighth Amendment, however, focuses on punishment and therefore applies post-conviction. *See Winker v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018). Because Primel was a pretrial detainee, the appropriate analysis starts with the Fourteenth Amendment. *Id.* Nevertheless, the difference is negligible because, after *Poynter*, the deliberate indifference standard articulated in *Farmer v. Brennan* governs Fourteenth Amendment claims as well. *See Poynter v. Shirley*, No. 25-5188, 2026 WL 2641092, at *6 (6th Cir. Sept. 8, 2026) (en banc).

Prison officials violate Fourteenth Amendment rights to adequate medical treatment when: (1) "the deprivation alleged [is], objectively, sufficiently serious" such that the inmate "is incarcerated under conditions posing a substantial risk of serious harm"; and (2) the prison official subjectively demonstrates "deliberate indifference to inmate health or safety." *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). In other words, the test asks whether there was a substantial risk of harm and whether the state knew about and disregarded it. *See Poyner*, No. 25-5188, 2026 WL 2641092, at *7.

***1. Objective Component Against Leonard***

The objective component is met when a plaintiff alleges a sufficiently serious medical need. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). There can be no doubt that a substantial suicide risk constitutes a serious medical need. *See Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994) ("[P]sychological needs may constitute serious medical needs, especially when they result in suicidal tendencies."); *see also Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (explaining that a sufficiently serious medical need is one that is so obvious even a lay person would recognize the necessity for medical attention). Here, plaintiff alleges that Primel: wrote several kites expressing a wish to die and threatening to kill herself; told her mother she had been placed in protective custody because she tried to kill herself; wrote a letter stating she would kill herself if her conditions

continued; attempted suicide by placing a metal object in an electrical outlet. ECF No. 83, PageID.1713-1719.

These allegations plausibly describe the kind of tendencies that the Sixth Circuit has recognized as serious medical needs. *See Comstock*, 273 F.3d at 703-04. Accordingly, Plaintiff has alleged sufficient facts to meet the objective standard, at this stage of the litigation.

***2. Subjective Component Against Leonard***

The first inquiry of the subjective component is whether defendant knew of the serious medical need. *Farmer*, 511 U.S. at 844. The official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and she "must also draw the inference." *Id.* at 837. Knowledge may be shown through circumstantial evidence, including obviousness of the risk. *Id.* at 842.

Based on Leonard's signing of plaintiff's intake form, this Court can draw the reasonable inference that defendant Leonard knew: 1) Primel had a history of prior suicide attempts; and 2) Primel had a death wish that was directly related to her current incarceration. *See* ECF No. 83, PageID.1713. Plaintiff further alleges that under ACH's own screening protocols, those answers constituted a positive suicide screen requiring mental health services and suicide observation. *Id.* at PageID.1716. The policy serves as circumstantial evidence of what Leonard understood Primel's

answers to mean. Accepted as true, these allegations permit a plausible inference that Leonard understood the risk the protocol was designed to identify. Accordingly, Plaintiff has sufficiently pled that Leonard was subjectively aware of a serious medical need.[4]

The Court now analyzes whether Plaintiff has alleged enough to assert that Leonard consciously disregarded Primel's serious medical needs. Plaintiff alleges that under ACH policies, Primel's positive suicide disclosures should have triggered additional mental health services, along with suicide observation. *Id*. at PageID.1716, 1736. According to Plaintiff, Defendant Leonard not only failed to comply with ACH policy to initiate a safety watch for suicidal detainees but also failed to communicate Primel's risk to Genesee County Jail staff and took no steps to further investigate Primel's condition after the initial disclosure. *Id*. at PageID.1736. Accepting Plaintiff's allegation that Leonard failed to act upon information that mandated suicide watch under ACH's policies, the Court can draw a reasonable inference that Leonard consciously disregarded a serious medical need.

---

[4] In *Lawler*, the Sixth Circuit held on summary judgment that an intake officer's knowledge of a remote suicide attempt, together with the detainee's denial of current ideation, did not create a jury question as to the officer's subjective knowledge. *See Lawler v. Hardeman Cty.*, 93 F.4th 919, 932 (6th Cir. 2024). That holding rested on deposition testimony about what the officer observed and concluded. *Id*. at 930-931. No such record exists here. Plaintiff alleges that ACH's own protocol treated Primel's answers as a positive suicide screen requiring action. *See* ECF No. 83, PageID.1716. Whether Leonard actually drew the inference that the protocol was designed to prompt is a question for discovery. Therefore, at this stage of the litigation, the Court finds that Plaintiff has alleged enough to meet the subjective requirement. That may prove different at the summary judgment stage, but for now, it is sufficient to state a claim.

A deliberate choice not to further investigate such a disclosure can itself be deliberate indifference. *See Farmer*, 511 U.S. at 843 n.8 ("[an official] would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true or declined to confirm inferences of risk that he strongly suspected to exist…"). Given the allegation that ACH's own protocol flagged Primel's answers as a positive screen, it is plausible that Leonard strongly suspected the risk those answers indicated.

In their Motion to Dismiss, Defendants contend that the Plaintiff is "required to allege that 1) the Decedent was at an *immediate* and *imminent* risk of self-harm, 2) that a *particular Defendant* was notified of the inmate's risk of self-harm in close temporal proximity of self-harm, and 3) the particular Defendant did nothing to prevent the *imminent* act of self-harm." ECF No. 86, PageID.1790-1791. The Court first notes that this is Defendant's own formulation of what the Plaintiff is required to allege. The Sixth Circuit has not adopted Defendant's framing, and none of the cases cited require that a Defendant be "notified" within "any close temporal proximity" to the decedent's death. Indeed, the Sixth Circuit has acknowledged that it "ha[s] yet to clarify" what constitutes a substantial risk of suicide. *Lawler v. Hardeman Cty.*, 93 F.4th 919, 929 (6th Cir. 2024).

Furthermore, each case Defendant cites for its formulation was decided at summary judgment. *See* ECF No. 86, PageID.1790-1791. Whether an official knew

of and disregarded a substantial risk "is a question of fact subject to demonstration in the usual ways, including inferences from circumstantial evidence." *Farmer*, 511 U.S. at 842. The cited cases resolved that question on developed records. The Sixth Circuit has cautioned that questions about what individuals knew, and how they were involved, are generally ones for discovery. *See Moderwell v. Cuyahoga Cty.*, 997 F.3d 653 (6th Cir. 2021). In *Moderwell*, following the suicide of a pretrial detainee, county officials argued that the complaint grouped them together and failed to adequately allege their knowledge of conduct underlying the claim. *Id.* at 663. The Sixth Circuit disagreed. It explained that although Plaintiff would have to show what each defendant did at summary judgment, her allegations were sufficient at the pleading stage, and the defendants' involvement in and knowledge of underlying conduct required "facts to be fleshed out during discovery." *Id.* at 665 (quoting *Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019)); *see also Hart v. Hillsdale Cnty.*, 973 F.3d 627, 640 (6th Cir. 2020).

Likewise, here, the Undersigned asks only whether Plaintiff has pled enough facts allowing a plausible inference that Leonard actually knew of a substantial risk that Primel would take her own life and disregarded it. For reasons stated above, the Court finds that she has. At summary judgment, Plaintiff will have the burden of showing that Leonard actually knew and concluded. ACH's arguments related to the time between intake screening and Primel's death, Primel's later denials of

having suicidal ideations, and whether any failure by Leonard caused Primel's death may be properly tested on a developed record.

Because this analysis rests only on allegations directed specifically at Leonard, ACH's argument that the complaint impermissibly relies on the collective acts of "Defendants" does not change the result. *See Rielly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012). Consequently, the request to dismiss the deliberate indifference claim against Lenoard is denied.

**D. Deliberate Indifference Claim Against John Doe Nurse**

John Doe Nurse has not been identified or served and is not a party to ACH Defendants' motion, which is brought on behalf of ACH and Leonard. ECF No. 86, PageID.1760. The motion nonetheless argues that the Sixth Amended Complaint contains no factual allegations describing individual conduct which can be attributed to John Doe Nurse. ECF No. 86, PageID.1764, 1775, 1780, 1793-1794. Plaintiff's response does not address this argument. Her statement of the questions presented is limited to Leonard, and her response to ACH's collective-pleading argument discusses only Leonard. ECF No. 90, PageID.1891, 1907. A court may dismiss a claim on its own initiative where the plaintiff has had notice of a deficiency and an opportunity to respond. *See Joslin v. Metro Nashville/Davidson Cnty.*, No. 3:12-CV-1284, 2013 WL 5372398, at *3 (M.D. Tenn. Sept. 24, 2013); *Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (affirming dismissal where plaintiff

abandoned claims by failing to raise them in his brief opposing a motion to dismiss); *cf. Bennett v. City of Eastpointe*, 410 F.3d 810, 816 (6th Cir. 2005) (court may rule on its own initiative where the losing party had notice and a reasonable opportunity to respond).

Dismissal is warranted on the merits as well. The Complaint identifies John Doe Nurse only as a "nurse who provided medical services to KATIE PRIMEL following KATIE PRIMEL's initial detention." ECF No. 83, PageID.1706-1707. Every other reference to him appears in allegations directed collectively at "Defendants" or at Leonard and John Doe together. *Id.* at PageID.1735-1736, 1739-1740. The Complaint does not allege when John Doe saw Primel, what he learned, or what he did or failed to do. "[T]he collective acts of defendants cannot be ascribed to each individual defendant." *Rielly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012). Accordingly, the claim against John Doe Nurse is dismissed without prejudice.

**E. *Monell* Liability for Failure to Train**

Finally, Plaintiff sufficiently alleges that ACH's challenged conduct caused the constitutional deprivation at issue. For a failure-to-train claim, the alleged training deficiency must be "closely related to or actually cause[] the injury." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738 (6th Cir. 2015); *see also Victor v. Reynolds*, 582 F. Supp. 3d 516, 522 (E.D. Mich. 2022). Likewise, an actionable

policy or custom must be the "moving force" behind the alleged constitutional injury. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

Defendants contend that Plaintiff fails to make that causal connection because the Complaint does not identify any ACH policy or training deficiency that drove an underlying constitutional violation, and because Plaintiff does not allege that Leonard personally treated Primel after her July 2021 intake assessment. ECF No. 86, PageID.1795. Plaintiff responds that ACH's inadequate training prevented its employees from appropriately monitoring and treating Primel's serious mental-health needs and that the resulting delay and failure to provide adequate treatment ultimately caused her death. ECF No. 90, PageID.1911-1912. In reply, Defendants maintain that Plaintiff's failure-to-train theory rests on "factually unsupported" and "conclusory assertions" concerning how ACH trains its medical providers, emphasizing that the Complaint contains no factual discussion of ACH mental-health staff sufficient to support those allegations. ECF No. 92, PageID.1984-1985.

The Court disagrees that Plaintiff's causation theory rests solely on conclusory assertions concerning ACH's training. The Sixth Amended Complaint alleges that ACH contracted to provide medical care at the GCJ in accordance with NCCHC standards and applicable facility rules. ECF No. 83, PageID.1712. At intake, Primel allegedly reported that she had recently wished she were dead, disclosed a history of suicide and a prior suicide attempt, and reported depression;

Leonard signed the Medical History and Health Appraisal documenting that history. *Id.* at PageID.1712-1713. Plaintiff further alleges that these responses constituted a positive suicide screen requiring mental-health services and suicide observation, but that Leonard failed both to place Primel on suicide observation and to advise GCJ staff that Primel was a suicide risk. *Id.* at PageID.1715-1716, 1735-1736. According to Plaintiff, the consequence of that failure extended beyond the initial assessment: "there was no communication amongst the chain of command indicating that PRIMEL should be placed on suicide watch," and ACH personnel thereafter failed or delayed needed treatment for Primel's serious mental-health needs. *Id.* at PageID.1716, 1736. Plaintiff ultimately alleges that ACH's deficient training and suicide precautions were the moving force behind the resulting deprivation and Primel's death. *Id.* at PageID.1736-1738.

Those allegations are sufficient at the pleading stage. In *Shadrick v. Hopkins County*, the Sixth Circuit explained that a failure-to-train plaintiff must establish that the inadequacy "actually caused, or was closely related to," the injury. 805 F.3d 724, 738 (6th Cir. 2015). The court nevertheless permitted the claim to proceed where the contractor's nurses allegedly failed, over the course of the inmate's care, to respond appropriately to a serious medical condition that was apparent upon his arrival. *Id.* at 744. Although several nurses participated in that course of care, the Sixth Circuit concluded that a reasonable jury could find that the contractor's lack

of training and supervision "actually caused, or was closely related to," the inmate's death. *Id.*

*Victor v. Reynolds* is also particularly instructive here as it applied the same principle at the pleading stage to ACH itself. 582 F. Supp. 3d 516, 524 (E.D. Mich. 2022). There, this Court held that causation was sufficiently pleaded where the plaintiff alleged that ACH's deficient "policies, acts, and practices led to Plaintiff being deprived his constitutional right to receive adequate medical care." *Id.* The Court did not require the complaint to establish through discovery-level detail precisely how ACH's internal training produced the challenged medical decision. *See id.* Rather, the alleged connection between the deficient training, the employee's handling of the recurring medical task, and the resulting deprivation was sufficient to state a *Monell* claim. *Id.* Here, Plaintiff likewise alleges that Leonard's inadequate training resulted in her failure to initiate suicide observation or communicate Primel's suicide risk, that ACH and its personnel thereafter failed or delayed necessary mental-health treatment, and that ACH's deficient training and suicide precautions resulted in Primel's death. ECF No. 83, PageID.1735-1738. Plaintiff's allegations therefore provide at least as much causal content as the allegations deemed sufficient in *Victor*.

Nor does the Court agree with Defendant's contention that Plaintiff's present inability to identify which ACH employee participated in each subsequent

interaction necessarily severs that causal chain. ECF No. 86, PageID.1798-1799. In *North v. Cuyahoga County*, the Sixth Circuit explained that municipal liability may arise where "the combined acts or omissions of several employees acting under a governmental policy or custom" produce the constitutional injury, even where the injury cannot be attributed entirely to one individual defendant. 754 F. App'x 380, 390 (6th Cir. 2018) (quoting *Epps v. Lauderdale County*, 45 F. App'x 332, 334-335 (6th Cir. 2002) (Cole, J., concurring)). *Stewart v. Warren County Board of Commissioners* subsequently relied on *North* in rejecting as "not quite correct" the argument that entity liability necessarily fails whenever the plaintiff cannot establish an individual constitutional violation by the specifically named employees. 821 F. App'x 564, 572 n.4 (6th Cir. 2020). The relevant inquiry remains whether the entity's own "policies, acts, and/or omissions" occasioned the constitutional harm. *Id.* This principle is pertinent here because Plaintiff alleges a failure to properly identify, communicate, monitor, and respond to Primel's suicide risk across her course of care, in addition to alleging an injury specifically attributable to Leonard's conduct, as the Court noted above. ECF No. 83, PageID.1715-1716, 1735-1738.

Indeed, the records Defendants themselves ask the Court to consider do not compel a contrary conclusion at this stage. Defendants point to a series of mental-health encounters in which Primel denied current suicidal ideation, including encounters on September 4 and 17, 2021; January 7, 13, 20, and 28, 2022; February

25, 2022; and March 3, 2022, four days before her death. ECF No. 86, PageID.1780-1782. Defendants rely on those encounters to argue that Primel was repeatedly evaluated and denied being suicidal. *Id.* But those records do not establish, as a matter of law, that Leonard's alleged failure at intake had no downstream effect on Primel's subsequent assessment, monitoring, or precautions. Whether an appropriate suicide-risk designation at intake would have altered the information available to later providers, triggered additional observation or reassessment, or otherwise changed Primel's subsequent course of care presents a factual question the Court cannot resolve on the face of the pleadings. *Passa*, 123 F. App'x at 697.

Accordingly, the Complaint adequately alleges that the deficiency in ACH's training was "closely related to or actually caused" the constitutional injury. *Shadrick*, 805 F.3d at 738. Plaintiff has alleged a factual chain connecting Primel's positive suicide-risk information, Leonard's alleged failure to act on and communicate that risk, the ensuing absence of suicide precautions and adequate mental-health treatment, and Primel's ultimate death. At the Rule 12(b)(6) stage, that is sufficient to plead causation.

Therefore, the failure to train claim against ACH has been pleaded with enough specificity to proceed to discovery.

## IV.

Accordingly, for the reasons explained above, **IT IS HEREBY ORDERED** that Defendants' Motion to Strike or, in the Alternative, to Dismiss Plaintiff's Sixth Amended Complaint (ECF No. 86) is **DENIED** as to Defendants ACH and Leonard, and **GRANTED** as to Defendant John Doe.

**IT IS FURTHER ORDERED** that the case is referred back to Magistrate Judge David R. Grand for the parties to proceed in accordance with Judge Grand's Scheduling Order at ECF No. 93; or as amended following the Court's disposition of this Motion, should Judge Grand deem it necessary.

**IT IS SO ORDERED.**

Dated: September 30, 2026
Detroit, Michigan

s/Brandy R. McMillion
HON. BRANDY R. MCMILLION
United States District Judge